**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DR. ROBERT BRUGLER,

     Plaintiff,

  v.

UNUM GROUP and PROVIDENT
LIFE AND ACCIDENT INSURANCE
COMPANY,

     Defendants.

No. 4:15-CV-01031

(Judge Brann)

**MEMORANDUM OPINION**

**SEPTEMBER 17, 2019**

## I.  INTRODUCTION

Plaintiff Dr. Robert Brugler, a dentist, bought a long-term disability policy from Defendants. This policy provided Dr. Brugler with monthly benefits were he to become disabled and unable to practice dentistry. Dr. Brugler was diagnosed with a retinal detachment in his right eye, and received surgery from Dr. Steven Marks, an ophthalmologist. Soon thereafter, Dr. Brugler filed a claim for disability benefits under his policy.

Defendants paid Dr. Brugler benefits for a number of months. They then sought to determine whether Dr. Brugler's condition had improved following his surgery. Dr. Michael Schaffer, a neuro-ophthalmologist and pediatric ophthalmologist, conducted an independent medical examination on Dr. Brugler.

Dr. Schaffer found that Dr. Brugler was not disabled and could return to his work. Defendants then stopped paying Dr. Brugler benefits under the policy.

In May 2015, Dr. Brugler filed a five-count complaint against Defendants, claiming he should receive disability benefits under the policy. Dr. Brugler stipulated to the dismissal of one count, and on November 2, 2018, this Court dismissed three other counts at summary judgment. The lone remaining claim is breach of contract, with Dr. Brugler asserting that Defendants breached the terms of the policy by refusing to pay him his entitled benefits.

A date certain jury trial has been set for October 7, 2019, and both parties have filed timely motions *in limine*. This opinion decides, at least in part, all the parties' motions.[1]

- Defendants have moved to preclude Dr. Marks from offering an opinion that Dr. Brugler is unable to perform the material and substantial duties of his occupation.[2] This motion is **granted.**

---

[1] The parties have briefed these motions *in limine*. The parties have also provided substantial testimony from Dr. Marks, Dr. Vander, and Dr. Friberg in the form of depositions, expert reports and affidavits. Accordingly, the Court finds that, for these experts, the factual record now before it allows proper resolution of these motions under the *Daubert* standard, without conducting a hearing. *See Feit v. Great W. Life & Annuity Ins. Co.*, 271 F. App'x 246, 253 (3d Cir. 2008) (court did not abuse its discretion in deciding motion *in limine* without a hearing when it could consider briefing and deposition testimony); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (court did not abuse its discretion in deciding motion *in limine* without a hearing when it could consider an expert's depositions and affidavits). But one of Defendants' experts, Dr. Schaffer, does not appear to have been deposed. The Court finds that it requires more development of the factual record with respect to Dr. Schaffer, and thus cannot at this time fully resolve Dr. Brugler's motion *in limine*. *See* below at 51-52.

[2] ECF No. 64. The parties seem to have used the somewhat cumbersome phrase "perform the material and substantial duties of his occupation" in their briefs to conform to language in the policy. *See* ECF No. 85 Ex. 1 at 4. The Court often uses the shorter phrase "practice dentistry" in this memorandum.

- Defendants have moved to preclude Dr. James Vander, a professor of ophthalmology and surgeon who evaluated Dr. Brugler in support of his claim, from offering an opinion that Dr. Brugler is unable to perform the material and substantial duties of his occupation.[3] This motion is **granted.**

- Defendants have moved to preclude Dr. Brugler from testifying as to his personal belief about Defendants' intentions in handling his claim, and as to Defendants' history of claim handling.[4] This motion is **granted.**

- As part of his independent medical evaluation, Dr. Schaffer tested Dr. Brugler's depth perception using a procedure called the Titmus test. Defendants have moved to preclude Dr. Brugler from submitting evidence that challenges the reasonableness of this testing.[5] This motion is **granted.**

- Dr. Brugler has moved to preclude Defendants from submitting testimony from Dr. Schaffer and from Dr. Thomas Friberg, a professor of ophthalmology who reviewed Dr. Brugler's records on Defendants' behalf.[6] This motion is **granted in part and denied in part with respect to Dr. Friberg and certain subjects of Dr. Schaffer's testimony.** The Court requires more development of the factual record with respect to Dr. Schaffer.

## II. FACTUAL BACKGROUND

### A. Dr. Brugler's Work as a Dentist

Before his retinal detachment, Dr. Brugler worked as a general dentist in State College, Pennsylvania.[7] He had a varied portfolio of duties, including restorative procedures, extractions, root canals, implant surgeries, orthodontics,

---

[3]   ECF No. 65.

[4]   ECF No. 66.

[5]   ECF No. 67.

[6]   ECF No. 74.

[7]   ECF No. 85 Ex. 2 at 11.

cosmetic work, teeth whitening, and X-rays and impressions.[8] When doing cosmetic work, implant surgery and other such procedures, Dr. Brugler needed to be able to visualize an area of less than one-tenth of a millimeter.[9]

### B. Dr. Brugler's Retinal Detachment, Consultation with Dr. Steven Marks, Ensuing Surgery and Disability Claim

After suffering flashing in his right eye and other symptoms, Dr. Brugler was diagnosed in July 2012 with a retinal detachment.[10] Seeking to remedy the situation, Dr. Brugler consulted with Dr. Steven Marks, an ophthalmologist practicing at Geisinger Medical Center in Danville, Pennsylvania.[11]

Dr. Marks attended medical school at Hahnemann Medical College, and then went into a residency program for general ophthalmology.[12] Following that, he participated in two eye-related fellowships at Tulane University.[13] Dr. Marks specializes in issues of the retina and often performs surgery on the retina.[14]

To treat Dr. Brugler's detachment, Dr. Marks performed a surgery on July 2, 2012 known as a pneumatic retinopexy.[15] This involves introducing a gas bubble

---

[8] *Id.* at 37-39; *see also* ECF No. 85 Ex. 3A at 8.

[9] ECF No. 85 Ex. 2 at 132-33.

[10] *Id.* at 18-20.

[11] *See* ECF No. 85 Ex. 6.

[12] ECF No. 85 Ex. 7 at 10-11.

[13] *Id.* at 11.

[14] *Id.* at 12.

[15] *Id.* at 15; ECF No. 85 Ex. 15 at 22.

into the affected eye and pushing the bubble against the retinal detachment so that the detachment flattens out.[16]

On July 18, 2012, Dr. Brugler filed a claim with Defendants for long-term disability benefits under his policy.[17] Dr. Brugler attested that "I can do limited driving and very little reading. I do not have depth perception and fine binocular vision for any activity. I do not expect to return to work," as "I can no longer perform any duties of my occupation as a dentist."[18] Dr. Brugler described his work duties as those of a "general dentist": "all facets of general dentistry including restorative procedures, extractions, root canals, implant placement, TMJ[19] treatments, etc."[20] He recounted that he spent 28 hours a week "chairside" working with patients, and an additional 12 hours a week on administrative duties.[21] Per Dr. Brugler, his alleged disability prevented him from working chairside, which "requires me to be seated for hours at a time, ranging from 1 1/2 to 6+ hours. It requires that I have excellent binocular vision. I routinely use lo[u]pe magnification and supplemental lighting. Without fine binocular vision I am unable to perform any chairside duties."[22]

---

[16]  ECF No. 85 Ex. 2 at 79; ECF No. 85 Ex. 15 at 38-39.

[17]  *See* ECF No. 85 Ex. 3A.

[18]  *Id.* at 5.

[19]  Temporomandibular joint disorder—a joint disorder of the mouth.

[20]  *Id.* at 8.

[21]  *Id.*

[22]  *Id.*

The parties dispute whether Dr. Brugler can practice dentistry after his retinal detachment and surgery. As this dispute has progressed, each side has enlisted multiple doctors to provide expert reports and testimony on its behalf.

## C.    Dr. Marks

Dr. Marks provided two expert reports on Dr. Brugler's behalf: one dated August 30, 2012, and one dated February 25, 2014.

### 1.    Dr. Marks' August 30, 2012 Report

On August 30, 2012, Dr. Marks reported that Dr. Brugler had "a retinal detachment that involved the macula," and that "the fovea, the center responsible for fine vision was detached." Per Dr. Marks, Dr. Brugler's "visual acuity at his last exam on August 21 is 20/50 in the right eye."

Dr. Marks then moves to assessing Dr. Brugler's prospects of practicing dentistry. Dr. Marks reports that Dr. Brugler "will have a permanent deficit with his fine binocular vision and depth perception. Because of this he is unable to perform his occupation adequately which is fine detail within the mouth as a dentist. [Dr. Brugler] needs to do work in the mouth that is quite precise to 1/10 of a millimeter with magnifying loops. This will not be possible with his current visual deficit."[23]

---

[23]    ECF No. 85 Ex. 19F.

## 2.     Dr. Marks' February 25, 2014 Report

On February 25, 2014, Dr. Marks submitted another expert report, which appears to respond to Dr. Schaffer's independent medical examination. Dr. Marks reports that the "cause of Dr. Brugler's visual problems" was the fact that the macula was off in his right eye's retina.[24] Per Dr. Marks, Dr. Brugler's "most problematic symptom is the lack of normal binocular vision"—"there is a chance that several surgeries might improve his vision, [but] he would still be left with altered depth perception from the macula-off nature of the retinal detachment."[25]

As in his first report, Dr. Marks assesses that Dr. Brugler could not practice dentistry: "[T]here is no way that [Dr. Brugler] could perform to the level that is required with the altered depth perception that he has been left with permanently because of the macula-off retinal detachment of the right eye."[26] In this report, Dr. Marks points out that Dr. Brugler "is not a general dentist."[27]

- "I am acutely aware of the difference between a general dentist and a specialist because my father did very similar work to Dr. Brugler. Dr. Brugler works in extremely small pockets within the mouth including but not limited to implant surgery, in which case he sometimes works with measurements that are less than tenths of a millimeter."[28]

---

[24]   ECF No. 85 Ex. 6 at 1.

[25]   *Id.* at 1-2.

[26]   *Id.* at 1.

[27]   *Id.* at 1.

[28]   *Id.* at 1.

- "[W]hen my father was involved with implant surgery, I often heard at the dinner table the discussions of the very small spaces and the extremely small margin of error."[29]

### 3. Dr. Marks' Knowledge and Process of Forming his Opinions

Dr. Marks testified that he "really [didn't] know much about general dentistry."[30] Indeed, Dr. Marks only expressed a "clear understanding" of one aspect of Dr. Brugler's duties: Dr. Brugler's "working inside the mouth . . . in a very small space."[31] And yet this "clear understanding" was based on Dr. Marks "making the assumption" that general dentistry involved "hav[ing] to work in a very small space."[32] Dr. Marks was "not sure" which exact duties Dr. Brugler could not perform that would "require him to . . . look in a small space."[33] Neither did Dr. Marks know what types of tools Dr. Brugler used in his day-to-day practice.[34] Casting new light on his two reports, Dr. Marks ultimately testified that he did not have the experience or the background to be able to testify within a reasonable degree of medical certainty that Dr. Brugler could not return to perform any of his occupational duties.[35]

---

[29] *Id.* at 1.

[30] ECF No. 85 Ex. 7 at 39.

[31] *Id.* at 22.

[32] *Id.* at 107.

[33] *Id.* at 173.

[34] *Id.* at 107.

[35] *Id.* at 40.

Dr. Marks testified that he wrote his February 25, 2014 report on the same day that Dr. Brugler visited him to talk about Dr. Brugler's disability case.[36] Dr. Marks did not examine Dr. Brugler during this visit.[37]

In both of his reports, Dr. Marks wrote that Dr. Brugler would have to visualize a space less than one-tenth of a millimeter in performing his duties as a dentist. Dr. Marks was pressed on this during his deposition. He testified that he could not remember how he came about this fact, and that he might have been relying on Dr. Brugler.[38]

After doing the pneumatic retinopexy surgery on Dr. Brugler in July 2012, Dr. Marks did not test the extent of Dr. Brugler's issues with depth perception.[39] And, even if Dr. Marks was so inclined, he could not have done this testing. For, though Dr. Marks understood that it was possible to quantify depth perception by degree, he was not familiar with that testing and had never been taught it.[40]

### D. Dr. Vander

#### 1. Dr. Vander's Background

Dr. Vander holds the position of Professor of Ophthalmology at Thomas Jefferson University in Philadelphia and serves as an attending surgeon at Wills

---

[36] *Id.* at 63.

[37] *Id.*

[38] *Id.* at 24-25.

[39] *Id.* at 42.

[40] *Id.* at 105-06.

Eye Hospital, also in Philadelphia. He graduated from the University of Michigan's medical school. He served a residency in ophthalmology at the University of Michigan and a fellowship at Wills Eye.[41]

Dr. Vander has authored four editions on a book on ophthalmology, which includes a section on the various options for repair of a retinal detachment.[42] He has also written textbook chapters that involve retinal detachments.[43] Dr. Vander has assisted in the peer review process for numerous journals on ophthalmology, and he has performed the pneumatic retinopexy surgery on hundreds of patients suffering from Dr. Brugler's variety of retinal detachment.[44]

## 2.    Dr. Vander's July 31, 2017 Report

Dr. Vander provided one report on Dr. Brugler's behalf, dated July 31, 2017. This letter contains general discourse on "the structure of the eye and how injury to the retina and macula may impact vision," as well as a summary of Dr. Brugler's treatment history and his current diagnoses, and general statements about patients with Dr. Brugler's variety of retina detachment.[45] But Dr. Vander makes clear that this report is meant to "offer my professional opinion as to whether Dr. Brugler has

---

[41]   ECF No. 85 Ex. 13.

[42]   ECF No. 85 Ex. 23 at 26.

[43]   *Id.*

[44]   *Id.* at 26-27.

[45]   *See* ECF No. 85 Ex. 12. Defendants do not appear to challenge these sections of Dr. Vander's letter. Indeed, Defendants note that they "are not challenging Dr. Vander's qualifications as a board-certified ophthalmologist in retinal surgery." ECF No. 65-1 at 13.

or may in the future be able to perform the important duties of his occupation." Dr. Vander concludes that "Dr. Brugler cannot perform these functions."[46]

Dr. Vander describes Dr. Brugler's practice as "focused . . . on restorative procedures, extractions, root canals, implant placement and TMJ treatment, as well as all other aspects of general dentistry, as needed." Dr. Vander notes that "Dr. Brugler's practice required that he work in confined spaces in the mouth, thus mandating that he have excellent binocular vision and fine vision. Dr. Brugler's surgical and restorative procedures routinely required him to visualize work at less than tenths of millimeters."[47]

Dr. Vander also attests of surgeons in general:

> Typical surgeons, be they dental or otherwise, have not only 'normal' vision, but almost invariably have exceptional vision. [A] modest reduction in depth perception and visual acuity is very likely to render a treating doctor's ability to perform procedures very difficult if not impossible. Furthermore, it is very difficult to quantify the impact of these effects. . . . In my experience, the distortion and impairment of vision created after a retinal detachment is a very common result, but very difficult to measure.[48]

According to Dr. Vander, (1) "the distortion and impairment of vision created after a retinal detachment," combined with (2) Dr. Brugler's "epiretinal membrane," (3) his "considerable vitreous capacities," and his (4) "early cataracts," meant that "the events surrounding [Dr. Brugler's] retinal detachment in

---

[46] ECF No. 85 Ex. 12 at 1.

[47] *Id.* at 2.

[48] *Id.* at 5.

2012 and subsequent changes within the retina as well as elsewhere in the eye rendered him incapable of this particular aspect of his occupation."[49] Dr. Vander's final conclusion is that Dr. Brugler's variety of retinal detachment "and resultant loss of fine vision and depth perception and visual distortion, loss of resolution, and vitreous matter floating in his axis of vision is a permanent visual defect, as Dr. Marks reported, preventing [Dr. Brugler] from safely treating patients."[50] As with Dr. Marks' second letter, Dr. Vander also claims that Dr. Schaffer was mistaken, arguing that, as Dr. Schaffer was not a retinal physician but rather a neuro-ophthalmologist, he "looks at this from a different perspective"—one that "misses the point."[51]

### 3. Dr. Vander's Knowledge and Process for Forming his Opinions

Dr. Vander understood Dr. Brugler's job duties to only involve implant dentistry.[52] But then Dr. Vander showed a lack of understanding of what implant dentistry involved, the consequences of reduced visual acuity in implant dentistry, and Dr. Brugler's duties as a general dentist outside of implant dentistry.

---

[49] *Id.* at 5-6.

[50] *Id.* at 6.

[51] *Id.* at 5.

[52] Throughout motion practice and discovery, the parties and experts seem to use the terms "implant dentistry," "implant surgery," "cosmetic dentistry," and "cosmetic surgery" interchangeably. For consistency, this memorandum refers to "implant dentistry" throughout.

Dr. Vander described Dr. Brugler's "field" as "implant dentistry," but then disclaimed that "I'm not an expert in implant dentistry."[53] Dr. Vander did not "know the consequences of reduced [visual] ability in that field," and did not know "implant dentistry enough to know if [these consequences were] something that could be monitored and assessed by someone who's an expert in the field.[54] According to Dr. Vander, if a surgeon specializing in implant dentistry had "vision good enough for [them] to believe that they can work, and an objective observer who's an expert in that field [could] verify the quality of work, I would not object." But Dr. Vander admitted that "I don't know whether that's possible."[55]

Dr. Vander stated that, in his understanding, the only key visual requirement for Dr. Brugler to perform the important duties of his profession was "the ability with great confidence to perceive differences in depths to a precision less than a millimeter, fractions of a millimeter."[56] In keeping, Dr. Vander expressly stated that his letter was not based on him "know[ing] what it takes to be a dentist," and that his letter was limited to assessing the areas of Dr. Brugler's work where he

---

[53]  ECF No. 85 Ex. 23 at 26.

[54]  *Id.*

[55]  *Id.* at 31.

[56]  *Id.* at 37; *see also id.* at 87 (Dr. Vander stating that the important duties "involve[d] procedures that include the placement of implants and working in, as Dr. Marks described, fine pockets with specificity within fractions of a millimeter.")

was "work[ing] in spaces that are [a] fraction of a millimeter where the margin for error requires that level of acuity."[57]

Aside from the need to work in areas a fraction of a millimeter, Dr. Vander was not aware of any of Dr. Brugler's other relevant duties.[58] And Dr. Vander did not know what percentage of Dr. Brugler's practice involved implant dentistry,[59] or even whether there were other aspects of Dr. Brugler's practice at all.[60] Dr. Vander did not know what Dr. Brugler's day-to-day duties were,[61] the level of precision required by the work Dr. Brugler had to perform on a day-to-day basis,[62] or whether Dr. Brugler had the ability to take a patient's x-rays, fill a cavity, or pull a tooth.[63] Dr. Vander disclaimed that he was "not sophisticated enough in the nuances of general dentistry to know whether there's any aspect of general dentistry that requires that same level of acuity [as implant dentistry.]"[64]

In his deposition, Dr. Vander stated that his opinion that Dr. Brugler could not return to performing the important duties of his profession was based on two objective facts. First: that "the retinal anatomy in his eye is not normal . . .

---

[57]   *Id.* at 32.

[58]   *Id.* at 87.

[59]   *Id.* at 86.

[60]   *Id.* at 39-40.

[61]   *Id.* at 50.

[62]   *Id.* at 77-78.

[63]   *Id.* at 51-52.

[64]   *Id.* at 40.

documented by [a particular eye test known as the] OCT."[65] And second: that Dr. Brugler's "stereoacuity is less than average when I will expect a surgeon doing that level of detailed work to have better than average acuity."[66]

But Dr. Vander also stated that his knowledge of what was required visually of Dr. Brugler to perform the important duties of his profession came from Dr. Marks' reports and their statement about Dr. Brugler's work "routinely requir[ing] him to visualize work at less than 10 millimeters."[67] Dr. Vander never inquired as to whether Dr. Marks had the expertise or knowledge to make that statement.[68] In preparing his report, Dr. Vander neither spoke to Dr. Brugler's staff to gain an understanding of Dr. Brugler's duties, nor spoke to a dentist in general to get assistance and guidance on what these duties might entail.[69]

### E.    Dr. Schaffer and the Titmus Testing

#### 1.    Dr. Schaffer's Background

Dr. Schaffer is a board-certified, fellowship-trained ophthalmologist, specializing in neuro-opthalmology and pediatric ophthalmology.[70] He specializes in eye issues related to the optic nerve, neurological diseases (including stroke and

---

[65]    *Id.* at 34.

[66]    *Id.* at 34.

[67]    *Id.* at 38.

[68]    *Id.* at 38.

[69]    *Id.* at 50.

[70]    ECF No. 85 Ex. 17 at 101; ECF No. 85 Ex. 12 at 3.

brain tumors), double vision, strabismus and eye disease in children.[71] He studied medicine at Jefferson Medical College in Philadelphia.[72] He then attended ophthalmology residency at the University of Pennsylvania, and served a fellowship in neuro-ophthalmology at the Montefiore Medical Center, Albert Einstein College of Medicine in New York, and a fellowship in pediatric ophthalmology at the University of Pennsylvania.[73] He currently works at Delray Eye Associates in Delray Beach, Florida.[74]

### 2. The Independent Medical Examination

Defendants, in investigating Dr. Brugler's medical condition following his surgery, referred Dr. Brugler to Dr. Schaffer for an independent medical examination. Dr. Schaffer conducted this examination on February 6, 2014. The examination entailed several tests of Dr. Brugler's eye and its visual acuity. These tests included a depth perception test known as the Titmus test.[75]

### 3. The Titmus Test

Testing a patient's "stereoacuity" (the smallest detectable depth difference that can be seen in binocular vision)[76] is the most prevalent method of testing a

---

[71] ECF No. 85 Ex. 17 at 101.

[72] ECF No. 81 Ex. A.

[73] *Id.*

[74] *Id.*

[75] ECF No. 85 Ex. 9 at 1-3.

[76] Merriam Webster, Medical Definition of *stereoacuity*, https://www.merriam-webster.com/medical/stereoacuity (last visited Sept. 17, 2019).

patient's depth perception.[77] The Titmus test (also known as Titmus fly testing or contour testing)[78] is the most common way to test a patient's stereoacuity.[79] It operates by showing the patient a picture of a fly with disparities in depth around the edges of the fly. The patient is tasked with determining whether they can make out a three-dimensional picture at the tested level of depth disparity.[80] Pediatric ophthalmologists and neuro-ophthalmologists, such as Dr. Schaffer, generally conduct Titmus tests.[81]

During discovery, each side provided expert testimony on the Titmus test.

- Dr. Marks testified he understood why the Titmus test was included in the independent medical examination, as it was an independent objective measure of Dr. Brugler's depth perception.[82]

- Before Dr. Vander started his residency, he needed to take a Titmus test to measure his stereoacuity.[83]

- For several years, Dr. Vander used the Titmus test to measure the depth perception of applicants looking for a training position in his retinal practice. If the applicant did not receive a certain score ("nine

---

[77] ECF No. 85 Ex. 7 at 177.

[78] *See* ECF No. 85 Ex. 15 at 8.

[79] ECF No. 85 Ex. 23 at 58; *see also* ECF No. 81-2 Ex. H, ¶ 5 ("Based on my training and experience, the Titmus test is the primary physical test used in the field to measure depth perception."). The Court notes as well that the Third Circuit has referred to the Titmus test as "an occupational vision test that is standard in the industry." *Polini v. Lucent Techs.*, 100 F. App'x 112, 115 n.3 (3d Cir. 2004).

[80] Michael Kalloniatis and Charles Luu, Perception of Depth, https://webvision.med.utah.edu/book/part-viii-psychophysics-of-vision/perception-of-depth/ (last visited Sept. 17, 2019).

[81] ECF No. 85 Ex. 7 at 42-43; ECF No. 85 Ex. 23 at 58.

[82] *See* ECF No. 85 Ex. 7 at 72, 93-96.

[83] ECF No. 85 Ex. 23 at 72-73.

out of nine"), then the applicant would not receive an offer.[84]

- Dr. Vander relied "on the fact that [Dr. Brugler's] stereoacuity [measured by Titmus test] was less than average" in reaching his opinion that Dr. Brugler could not perform the important duties of his profession.[85] Dr. Vander also considered "the measured abnormality in [Dr. Brugler's] stereoacuity testing" to be objective medical evidence of Dr. Brugler's "distortion post-surgery."[86]

- Dr. Friberg testified that there were probably journal articles stating that the Titmus test was unreliable, but that he had not read those articles.[87]

- Dr. Friberg testified that he was "sure somebody would say [the Titmus test was] unreliable," but he implied that the Titmus test was more reliable than other tests of stereoacuity.[88]

Dr. Brugler also submitted several journal articles that discuss the Titmus test and its reliability. First, Dr. Brugler submitted a 2018 article from the journal *Clinical and Experimental Optometry* entitled "Stereopsis: are we assessing it in enough depth?"[89] This article makes several summary statements about the efficacy of stereoacuity tests in general, asserting that "[c]urrent tests are limited in the aspects of stereoacuity they assess and their ability to precisely measure stereopsis [depth perception]. . . . Current clinical tests are limited in their presentation, and are poor in detecting/measuring stereoacuity in those with limited

---

[84]  *Id.* at 72.

[85]  *Id.* at 34.

[86]  ECF No. 85 Ex. 23 at 56.

[87]  ECF No. 85 Ex. 15 at 12.

[88]  *Id.* at 8.

[89]  ECF No. 74-3 Ex. E-1.

stereopsis."[90] The article reports of the Titmus test specifically that it is "commonly used in vision labs and clinics around the world," but "it is easy to guess the response due to monocular cues and familiarity with objects."[91] The article concludes that "[c]urrent clinical assessments of stereoacuity are effective at detecting good levels of stereoacuity, with data available to evaluate whether the response is normal, or represents a change in the clinical condition. However, they do not accurately reflect a person's perception of stereopsis in real life, in particular due to the small, flat, static nature of the stimuli."[92]

Dr. Brugler also submitted an abstract of a 2014 journal article from the journal *American Orthoptic Journal* entitled "Modification of the titmus fly test to improve accuracy." The abstract states that "[i]n spite of its well-known flaws, the Titmus test is still the most commonly available and frequently utilized stereotest worldwide." It presents "an alternative method of presentation designed to decrease the [test's] false positive rate," concluding that this method, under certain circumstances, would "improve accuracy and precision of results."[93]

Finally, Dr. Brugler submitted the summary of a 2015 journal article from the *Journal of American Association for Pediatric Ophthalmology and Strabismus* entitled "An Evaluation of the Agreement Between Contour-Based Circles and

---

[90] *Id.* at 1.

[91] *Id.* at 3.

[92] *Id.* at 8.

[93] ECF No. 74-3 Ex. E-2.

Random Dot-Based Near Stereoacuity Tests." This article relates an experiment to compare the Titmus test with another stereoacuity test, the "Randot circles" test. The experiment found that in patients with "a history of anomalous binocular vision," "better stereoacuity scores were acquired using [the Titmus test] than [the Randot test]."[94]

During his deposition, Dr. Vander testified that he had no reason to dispute Dr. Schaffer's calculations or the way that Dr. Schaffer conducted the Titmus test.[95] Likewise, Dr. Marks during his deposition also could not dispute Dr. Schaffer's findings or the calculations that Dr. Schaffer made when performing the Titmus test.[96]

### 4. Dr. Schaffer's February 11, 2014 Report

On February 11, 2014, Dr. Schaffer submitted a report to Defendants based on the independent medical examination that he conducted on February 6, as well as on his review of the records associated with Dr. Brugler's insurance claim and Dr. Brugler's medical history.[97] The report makes factual findings on (a) Dr.

---

[94] ECF No. 74-3 Ex. E-3. It is unclear from the limited summary that Dr. Brugler provided whether "better" means higher scores, or more accurate scores. Further, the summary states that "stereoacuity score disagreement was evident across the entire range of measurable stereoacuity." Dr. Brugler argues that this statement should be taken to indicate internal differences or inconsistency between Titmus test results. But it appears that this argument takes this statement out of context—"disagreement" instead appears to refer to differences between the Titmus test results and Randot test results. Again, this is difficult to ascertain from the limited summary that Dr. Brugler provided.

[95] ECF No. 85 Ex. 23 at 67.

[96] ECF No. 85 Ex. 7 at 114.

[97] ECF No. 85 Ex. 9.

Brugler's medical history; (b) Dr. Brugler's reported symptoms; (c) the results of the medical tests that Dr. Schaffer performed; (d) Dr. Schaffer's analysis as to the condition of Dr. Brugler's eye; and (e) Dr. Schaffer's assessment of whether Dr. Brugler could practice dentistry.

Dr. Schaffer reports that "Titmus testing revealed 7 out of 9 graded circles correctly identified, indicating 60 arcseconds of stereoacuity (40 arcseconds generally considered normal)."[98] He gives the following high-level summary of the results of his examination and the condition of Dr. Brugler's eye.

> Dr. Brug[l]er's neuro-opthalmic examination demonstrates a mild loss of acuity and ganglion cell damages following macula-off retinal detachment. He has slightly diminished stereoacuity and no evidence of significant ocular misalignment to coincide with the severity of his complaints regarding depth perception, specifically those such as pouring his coffee and parking his car. Some of his symptoms at near could be due to presbyopia, which is a normal finding of aging and would likely improve with a stronger prescription where the reading add is concerned.[99]

Dr. Schaffer finishes his opinion by assessing Dr. Brugler's ability to perform his work. Dr. Schaffer states that he "believe[s] magnifying loops, perhaps with base-in prism, would be quite helpful in regard to [Dr. Brugler's] near work in the office. As to [Dr. Brugler's] inability to perform non-microscopic dental

---

[98] ECF No. 85 Ex. 9 at 2.

[99] ECF No. 85 Ex. 9 at 3-4.

surgery, I cannot relate a loss of 20 arcseconds of stereoacuity to complete disability (this equates to approximately 5/100 of a degree)."[100]

### F. Dr. Friberg

#### 1. Dr. Friberg's Background

Dr. Friberg is a professor of ophthalmology at the University of Pittsburgh School of Medicine.[101] He has over forty years of experience in retinal surgery.[102] He attended medical school at the University of Minnesota. He then participated in an ophthalmology residency at Stanford University, a retina fellowship at the Massachusetts Eye & Ear Infirmary, and a vitreous fellowship at the Duke Eye Center.[103]

#### 2. Dr. Friberg's November 30, 2017 Report

On November 30, 2017, Dr. Friberg submitted a report based on his "independent review" of Dr. Brugler's records. The report has three principal topics: (1) the condition of Dr. Brugler's right eye, (2) the visual prognosis of the type of retinal detachment that Dr. Brugler suffered, and (3) whether Dr. Brugler could practice dentistry. Dr. Friberg's findings on the condition of Dr. Brugler's right eye are largely recapitulations of previous doctor's reports and medical records.

---

[100] ECF No. 85 Ex. 9 at 4.

[101] ECF No. 85 Ex. 14 at 1.

[102] *Id.* at 2.

[103] ECF No. 81-1 Ex. E.

Dr. Friberg offers that "the visual prognosis of [Dr. Brugler's variety of] retinal detachment is not uniformly poor." Dr. Friberg states that "I have operated upon surgeons, artists and many other individuals whose employment requires fine manipulation who have had macular off detachments who returned to their professions after surgery."[104] According to Dr. Friberg, because "the fovea was not totally detached in Dr. Brugler's right eye," "better visual function and a good prognosis would be expected in such a case."[105]

Dr. Friberg finds it "an exaggeration" to say that "since Dr. Brugler had a macula-off detachment, he would be unable to conduct the fine motor tasks of dentistry." Dr. Friberg then reports Dr. Schaffer's Titmus test reading, finding that "within the normal range for a man in his sixties," before concluding that [b]ased on my review of the records, along with my training and experience, it is my opinion that Dr. Brugler's detachment was successfully repaired and that he should not be precluded from returning to his dental practice."[106]

### 3. Dr. Friberg's Knowledge and Process for Forming his Opinions

Dr. Friberg stated that he reviewed a significant number of medical records and a significant amount of deposition testimony in rendering his expert

---

[104] ECF No. 85 Ex. 14 at 2.

[105] *Id.* at 2.

[106] *Id.* at 3.

opinions.[107] In making his finding that Dr. Brugler was not disabled, Dr. Friberg relied on the results of Dr. Brugler's visual acuity tests, the results of Dr. Schaffer's Titmus testing, his "experience after retinal detachment surgery of successful repair," the fact that there was no "scarring underneath the sensory retina," and the fact that, in Dr. Brugler's case, his retina was not "grossly wrinkled"—Dr. Brugler lacked "gross findings that often are apparent when someone has distortion, for instance, such as retinal folds."[108]

Dr. Friberg reviewed the results of the Titmus test conducted by Dr. Schaffer, as well as the results of a Titmus test that another physician, Dr. Harvey Hanlen, had conducted.[109] Dr. Friberg testified that he was knowledgeable about stereoacuity testing and had previously personally performed Titmus testing on patients, though this was a "very tiny amount" of his practice.[110] Dr. Friberg relied upon the Titmus test to measure his patients' stereoacuity.[111] He did not research whether the specific protocols that Dr. Schaffer used for his Titmus test were

---

[107] In total, Dr. Friberg reviewed medical records from Dr. Harvey Hanlen, Dr. Fred Carlin, Dr. Christopher Cessna, Dr. Joseph Walker, Dr. Marks, and Dr. Schaffer. The first four were additional doctors that Dr. Brugler had consulted with in seeking assistance. Dr. Friberg also reviewed deposition testimony from Dr. Brugler and Dr. Marks. ECF No. 85 Ex. 14 at 1.

[108] ECF No. 81-2 Ex. H at ¶ 22, ECF No. 85 Ex. 15 at 34, 40, 67.

[109] *Id.* at 14-16.

[110] *Id.* at 8, 10-11.

[111] *Id.* at 29.

reliable.[112] He had not encountered any peer-reviewed articles indicating that the Titmus test was considered to be unreliable and should be avoided.[113]

Dr. Friberg had a very basic knowledge of a dentist's duties. He understood that generally a dentist works in the mouth.[114] He also knew that general dentistry involves filling cavities, making crowns, reading X-rays, and pulling teeth.[115] But Dr. Friberg had not studied or spoken to anyone about the level of depth perception that a dentist needed to possess in order to perform an implant procedure or implant dentistry,[116] or to prepare impressions or deliver and fill veneers.[117] For this, Dr. Friberg appeared to be relying on the statements in Dr. Marks' reports, and echoed by Dr. Vander, that precision of a tenth of a millimeter was required for this kind of dental work.[118]

## III.   LAW

Both parties have presented motions *in limine* for the Court's consideration. Motions *in limine* are threshold motions, those through which courts will typically deny and defer a ruling until the time of trial (outside of the presence of the jury), unless the evidence is clearly inadmissible prior to trial. Determinations on

---

[112] *Id.* at 12.

[113] *Id.* at 12-13.

[114] *Id.* at 51.

[115] *Id.* at 51.

[116] *Id.* at 50.

[117] *Id.* at 49.

[118] *See id.* at 50.

motions *in limine* are preliminary rulings, those which the Court may adjust after the evidence has been developed at trial. Although neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure expressly acknowledge motions *in limine* or provide for their use, "the practice has developed pursuant to the district court's inherent authority to manage the course of trials."[119]

Defendants' motions targeting Dr. Marks and Dr. Vander, and Dr. Brugler's motion, all proceed by challenging the admissibility of expert testimony. Federal Rules of Evidence 702 and 703 govern.

### Rule 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.[120]

### Rule 703. Bases of an Expert's Opinion Testimony

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise

---

[119] *Luce v. United States*, 469 U.S. 38, 31 n.4 (1985).

[120] Fed. R. Evid. 702.

be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.[121]

In 1993, the Supreme Court of the United States set out the standard for admissibility of expert testimony in federal court in *Daubert v. Merrell Dow Pharm., Inc.*[122] The Court in *Daubert* delegated to district courts a "gatekeeping responsibility" under Rule 702, which requires them to "determine at the outset" whether an expert witness can "testify to (1) scientific knowledge that (2) will assist the trier of fact."[123] That gate-keeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether that reasoning or methodology properly can be applied to the facts in issue."[124] *Daubert* also clarified that the proponents of the expert must establish admissibility by a preponderance of the evidence.[125]

Though it recognized that "many factors" are relevant to this inquiry and that "a definitive checklist or test" does not exist, the *Daubert* Court enumerated four relevant questions for district courts to consider when making the Rule 702

---

[121] Fed. R. Evid. 703.

[122] 509 U.S. 579 (1993).

[123] *Daubert*, 509 U.S. at 592.

[124] *Id.* at 592-93.

[125] *Id.*, at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)). *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (Becker, J.) ("This does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are <u>correct</u>, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.").

determination: (1) whether the disputed methodology is testable; (2) whether the disputed methodology has been peer-reviewed; (3) the methodology's known or potential rate of error; and (4) whether the methodology is generally accepted in the relevant scientific community.[126]

*Daubert* explained that district courts should conduct this inquiry in addition to that already mandated by Federal Rules of Evidence 703, which governs admission of expert testimony using data reasonably relied upon by experts in a particular field, and Federal Rule of Evidence 403, which permits exclusion of relevant evidence whose "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[127] A district court "exercises more control over experts than over lay witnesses," the Supreme Court observed, since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[128] Six years later, in *Kumho Tire Co. v. Carmichael*, the Supreme Court extended *Daubert*'s holding as well as the district court's gate-keeping role beyond scientific expert testimony to all expert testimony based on "technical" or "other specialized knowledge."[129]

---

[126] *Daubert*, 509 U.S. at 593–94.

[127] Fed. R. Evid. 403.

[128] *Daubert*, 509 U.S. at 595 (quoting Hon. Jack B. Weinstein, <u>Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended</u>, 138 F.R.D. 631, 632 (1991)).

[129] 526 U.S. 137 (1999)

In 1994, the United States Court of Appeals for the Third Circuit issued its interpretation of *Daubert* in *In re Paoli R.R. Yard PCB Litig.*, a decision known as *Paoli II*.[130] *Paoli II* cast the expert admissibility determination in light of three requirements: (1) qualification; (2) reliability; and (3) fit.[131] The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert.[132] The Third Circuit has interpreted this requirement broadly.[133] In this Court's view, the requirement that does the most work is naturally that of reliability. To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[134] *Paoli II* set forth an additional four factors to those provided in *Daubert*. That list of factors, which "a district court should take into account," reads as follows:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[135]

---

[130]  35 F.3d 717, 730 (3d Cir. 1994).

[131]  *Id.* at 741-43.

[132]  *Id.* at 741.

[133]  *See id.*

[134]  *See id.* at 742 (quoting *Daubert*, 509 U.S. at 589).

[135]  *See Paoli II*, 35 F.3d at 742 n.8.

With regard to the third prong, fit, the *Paoli II* Court explained that admissibility "depends . . . on 'the proffered connection between the scientific research or test result . . . and [the] particular disputed factual issues.'"[136] In recognition then of *Paoli II's* interpretation of *Daubert*, Third Circuit courts confronting expert witness issues have recognized that admissibility requires a proffered expert to surpass "a trilogy of restrictions": qualification, reliability and fit.[137]

Defendants' motion seeking to preclude Dr. Brugler from challenging the reasonableness of the Titmus test, and their motion seeking to preclude Dr. Brugler from testifying about Defendants' intentions in handling the claim and history of claim handling, each argue that the targeted topic of testimony is irrelevant to Plaintiff's remaining breach of contract, and even if relevant, its probative value would be substantially outweighed by its overly prejudicial effect on Defendants. Federal Rules of Evidence 401 and 403 govern.

> **Rule 401. Test for Relevant Evidence**
> Evidence is relevant if:
>
> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and;
>
> (b) the fact is of consequence in determining the action.[138]

---

[136] *See id.* at 743 (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)).

[137] *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

[138] Fed. R. Evid. 401.

**Rule 403. Bases of an Expert's Opinion Testimony**
The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.[139]

The Third Circuit has approved the view of the Federal Rules of Evidence's Advisory Committee that "[r]elevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." *Blancha v. Raymark Indus.*, 972 F.2d 507, 514 (3d Cir. 1992). Evidence is irrelevant "only when it has *no* tendency to prove" "a consequential fact." *Id.* (emphasis added) (internal citation omitted).

Under Federal Rule of Evidence 403, "evidence may be excluded when its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issues." "Evidence relating to previous litigation involving the parties, evidence which has an aura of scientific infallibility but is likely to be used for purposes other than that for which it was introduced, and evidence of statistical probabilities are all likely subjects of exclusion." As the rule's operation entails excluding "concededly probative" evidence, evidence should be excluded under Federal Rule of Evidence 403 "only sparingly," with "the balance [to] be struck in favor of admissibility. *Id.* at 516 (internal citations omitted).

---

[139]  Fed. R. Evid. 403.

## IV. ANALYSIS

The Court now analyzes the proffered topics and potential topics of testimony in light of *Daubert*, *Paoli II*, and Federal Rules of Evidence 401, 403, 702 and 703. Because Dr. Marks and Dr. Vander were not qualified to testify on the topic of whether Dr. Brugler is able to practice dentistry, and their testimony on this topic was not based on scientifically valid methods or procedures, this topic of testimony is excluded. Dr. Brugler's personal belief about Defendants' intentions in handling his claim, Defendants' history of claim handling, and the reasonableness of Titmus testing all are topics not relevant to the breach of contract claim before the Court, and their inclusion would prove unduly prejudicial to Defendants. Thus, testimony on these topics is also excluded.

Dr. Friberg was qualified to testify on the topics of Dr. Brugler's eye and his visual ability, and he used scientifically valid methods and procedures to produce testimony on these topics. Further, including these topics of testimony would assist the trier of fact. Therefore, Dr. Friberg's testimony on these topics is included. However, Dr. Friberg, like Dr. Marks and Dr. Vander, was not qualified to testify on the topic of whether Dr. Brugler is able to practice dentistry, and this testimony was not based on scientifically valid methods or procedures. Therefore, Dr. Friberg's testimony on this topic is excluded.

Dr. Schaffer was qualified to testify on the topics of Dr. Brugler's eye and his visual ability, and he used scientifically valid methods and procedures to

produce testimony on these topics. Further, including these topics of testimony would assist the trier of fact. Therefore, Dr. Schaffer's testimony on these topics is included. The Court finds that it requires more development of the factual record with respect to Dr. Schaffer before it can rule on whether Dr. Schaffer's testimony on Dr. Brugler's ability to practice dentistry should be excluded.

**A.  Dr. Marks' and Dr. Vander's Testimony on Whether Dr. Brugler is Able to Perform the Material and Substantial Duties of His Occupation is Excluded, as Dr. Marks and Dr. Vander Were Not Qualified and Their Testimony Was Not Based on Scientifically Valid Methods or Procedures.**

Two of Defendants' motions *in limine* aim to exclude Dr. Brugler's experts, Dr. Marks and Dr. Vander, from offering opinions that Dr. Brugler is unable to practice dentistry. These motions are granted, and the associated expert opinions on this topic are excluded,[140] for two reasons. First, Dr. Marks and Dr. Vander were not qualified to give expert testimony on this topic. And second, their testimony on this topic was not based on scientifically valid methods or procedures.

---

[140] Dr. Marks and Dr. Vander present some expert testimony outside of the topic of whether Dr. Brugler can practice dentistry. For example, Dr. Vander presents expert testimony on the structure of the human eye. Defendants' motions *in limine* appear to only target the testimony concerning Dr. Brugler's ability to practice dentistry. *See, e.g.*, ECF 64 at 3 ("Defendants . . . respectfully request[] that [Dr. Marks be precluded] from offering an opinion that Plaintiff is unable to perform the material and substantial duties of his occupation."); ECF 65 at 3 (the same request as pertaining to Dr. Vander); ECF 64-1 at 10 ("Defendants are not challenging Dr. Marks' qualifications as a retinal surgeon"); ECF 65-1 at 13 ("Defendants are not challenging Dr. Vander's qualifications as a board-certified ophthalmologist in retinal surgery.") Therefore, only the sections of Dr. Marks and Dr. Vander's expert reports that include their opinions on whether Dr. Brugler can practice dentistry will be excluded.

### 1. Dr. Marks and Dr. Vander Were Not Qualified to Give This Expert Opinion.

The Third Circuit has held that a potential expert witness must possess "sufficient knowledge" of a given subject in order to testify as an expert on that subject. *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055-56 (3d Cir. 1997). Here, Dr. Marks and Dr. Vander wish to testify as an expert on whether Dr. Brugler can perform the duties of a general dentist. Logic dictates that in order to form this opinion, Dr. Marks and Dr. Vander must possess sufficient knowledge of the duties of a general dentist.

Dr. Marks lacked sufficient knowledge of general dentistry. As Dr. Brugler made clear, general dentistry is a multi-faceted, multi-dimensional practice.[141] But Dr. Marks reduced the multi-faceted practice of general dentistry to one facet, implant dentistry, and did so not based on hard evidence or data but on an assumption.[142] Dr. Marks betrayed that this was just an assumption by repeating the infinitesimal statistic that has echoed throughout the corridors of this dispute: that Dr. Brugler would have to visualize a space less than one-tenth of a millimeter in performing his duties as a general dentist.[143] Despite the apparent importance of

---

[141]  ECF No. 85 Ex. 3A at 8.

[142]  *See* ECF No. 85 Ex. 7 at 22, 107.

[143]  ECF No. 85 Ex. 19F ("[Dr. Brugler] needs to do work in the mouth that is quite precise to 1/10 of a millimeter with magnifying loops."); ECF No. 85 Ex. 6 at 1 ("Dr. Brugler works in extremely small pockets within the mouth including but not limited to implant surgery, in which case he sometimes works with measurements that are less than tenths of a millimeter.").

this figure, Dr. Marks could not remember its source. It might have emerged not from Dr. Marks' own knowledge of general dentistry, but from Dr. Brugler.[144]

Not only did Dr. Marks focus his vision only on implant dentistry (disregarding all other aspects of the practice), he also showed a lack of knowledge of implant dentistry itself. Dr. Marks could not articulate any specific implant dentistry tasks that would require Dr. Brugler having to look in a very small space.[145] And Dr. Marks did not know the tools of even this limited trade: Dr. Marks did not know the tools that Dr. Brugler used in his practice.[146]

Dr. Marks ended up admitting that he did not have the experience or background to provide expert testimony that Dr. Brugler could not return to perform any of his occupational duties as a general dentist (not just implant dentistry).[147] The Court agrees with Dr. Marks on this point. Dr. Marks lacked sufficient knowledge of general dentistry, and therefore was not qualified to give an expert opinion on whether Dr. Brugler could practice general dentistry. *See Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055-56 (3d Cir. 1997) (potential witness was not qualified when witness's theory was based on "an area in which [they had] no training and no experience"; witness had read no literature on the area, had not done any testing or studies in the area, and relied on another "as the

---

[144] ECF No. 85 Ex. 2 at 24-25.

[145] *Id.* at 107.

[146] *Id.* at 107.

[147] ECF No. 85 Ex. 7 at 40.

sole authoritative basis for his conclusions" about the area); *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114–15 (3d Cir. 1987) (potential witness was not qualified when they had no knowledge, experience, or training in area).[148]

Dr. Vander also lacked sufficient knowledge of general dentistry. As with Dr. Marks, Dr. Vander narrowed the field of play from general dentistry to implant dentistry.[149] Yet, in a contradiction, Dr. Vander both (1) claimed that an implant dentist such as Dr. Brugler needed "to perceive differences in depths to a precision less than a millimeter," and (2) claimed he did not know the consequences of vision issues on an implant dentist.[150]

That was not all that Dr. Vander did not know. He did not know whether Dr. Brugler had any other duties besides perceiving those ultra-precise differences,[151]

---

[148] *See also Burton v. Danek Med., Inc.*, No. CIV.A. 95-5565, 1999 WL 118020, at *3-4 (E.D. Pa. Mar. 1, 1999) (witness lacked sufficient knowledge of area as witness lacked training, experience, or basic knowledge of area, had reviewed only literature provided by plaintiff's counsel and had performed no independent research); *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D.N.J. 1995) (potential expert excluded as he lacked experience in area and had "at best a limited familiarity with the small amount of literature in the field"); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1476 (D.V.I.), *aff'd*, 46 F.3d 1120 (3d Cir. 1994) (potential expert excluded as their only knowledge or experience on area came from "review, for purposes of testifying in litigation, of selected literature"); *Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F. Supp. 977, 982 (M.D. Pa. 1982), *aff'd*, 720 F.2d 662 (3d Cir. 1983), and *aff'd sub nom. Volkswagen Werk Aktiengesellschaft v. Hummel*, 720 F.2d 669 (3d Cir. 1983) (testimony was properly excluded as witness had "only minimal training" in area); *Globe Indem. Co. v. Highland Tank & Mfg. Co.*, 345 F. Supp. 1290, 1291-92 (E.D. Pa. 1972), *aff'd*, 478 F.2d 1398 (3d Cir. 1973) (potential experts excluded as they lacked "any prior experience or observational knowledge" in area)

[149] ECF No. 85 Ex. 23 at 26.

[150] *Id.* at 26, 37, 87.

[151] *Id.* at 39-40, 86-87.

what Dr. Brugler had to do on a day-to-day basis,[152] or how precise Dr. Brugler had to be when he was carrying out his daily duties.[153] Given the scope and pervasiveness of Dr. Vander's lack of knowledge, the Court finds that he also lacked sufficient knowledge of general dentistry, and therefore was not qualified to give an expert opinion on whether Dr. Brugler could practice general dentistry. *See Surace*, 111 F.3d at 1055-56; *see also Aloe Coal*, 816 F.2d 110, 114-15.

The Court acknowledges that the Third Circuit has established a permissive standard in this area, and that trial courts cannot exclude testimony simply because a potential expert is not the "best qualified" or "does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996); *see also Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982) (holding that "an individual need possess no special academic credentials to serve as an expert"). But, in the Court's estimation, these two potential experts fell below the required standard not as a matter of degree, but as a matter of kind. There is a gulf between essentially no knowledge, as here, and knowledge that does not suit a district court's exact preferences. The Court believes this case is inapposite to the *Holbrook* and *Hammond* line, and belongs with *Surace* and its progeny.

---

[152] *Id.* at 50.

[153] *Id.* at 77-78.

### 2. The Testimony of Dr. Marks and Dr. Vander Was Not Based on Reliable Methods or Procedures.

Even if Dr. Marks and Dr. Vander were qualified expert witnesses, their testimony on this topic must be excluded because this testimony was not reliable. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (interpreting *Daubert* to mean that "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.").

Dr. Marks' testimony is not reliable because it is based on an assumption that lacks any factual foundation. As observed above, Dr. Marks was "making the assumption" that general dentistry involved "hav[ing] to work in a very small space."[154] He had no factual foundation for his repeated factual assertion that Dr. Brugler would have to appreciate a visual space of under a tenth of a millimeter in performing his duties as a dentist.[155] In performing a *Daubert* reliability analysis, district courts in the Third Circuit cannot "admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002). This is such testimony. And as such, it must be excluded. *See also Miller v. United States*, 287 F. App'x 982, 984 (3d Cir. 2008) (expert opinion on the cause of plaintiff's injuries that was based "on no more than [the plaintiff's] subjective complaints and the resolution of [the plaintiff's] symptoms after surgery" was appropriately disregarded").

---

[154] ECF No. 85 Ex. 7 at 107.

[155] ECF No. 85 Ex. 7 at 24-25.

Dr. Vander, in his reliance on Dr. Marks' unreliable testimony, is also ensnared. Dr. Vander stated that his knowledge of what was required of Dr. Brugler to perform the important duties of his occupation was based on Dr. Marks' reports and their statements about "the work of [Dr. Brugler] routinely requir[ing] him to visualize work at less than 10 millimeters."[156] But Dr. Vander never inquired as to whether Dr. Marks had the expertise or knowledge to make that precise statement, and does not appear to have made any attempt to verify or corroborate this data point.[157] In preparing his report, Dr. Vander neither spoke to Dr. Brugler's staff to gain an understanding of Dr. Brugler's duties, nor spoke to a dentist in general for assistance.[158]

Dr. Vander's course of action here poses a problem for two reasons. First, as this Court has held recently in another battle over expert testimony, "experts who use data in their report without independently verifying the accuracy or reliability of those figures fail to satisfy this Circuit's reliability requirement."[159] Dr. Vander used the fractions-of-a-millimeter data point without verifying its accuracy or reliability, and therefore the testimony hinging on this data point must be excluded. *See In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999) (finding that an expert's blind reliance on other expert opinions demonstrated flawed methodology under

---

[156] ECF No. 85 Ex. 23 at 38.

[157] *See* ECF No. 85 Ex. 23 at 38.

[158] ECF No. 85 Ex. 23 at 50.

[159] *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015).

*Daubert*). Second, as discussed above, Dr. Marks' fractions-of-a-millimeter data point is itself inadmissible. And one expert witness "cannot establish [an opinion] through the inadmissible opinions and testimony of" another expert witness." *Fabrizi v. Rexall Sundown, Inc.*, No. CIV.A.01-289, 2004 WL 1202984, at *10 (W.D. Pa. June 2, 2004), report and recommendation adopted (June 24, 2004).

B.    **Dr. Brugler's Personal Belief About Defendants' Intentions in Handling his Claim, Defendants' History of Claim Handling, and the Reasonableness of Titmus Testing All Are Topics Not Relevant to the Breach of Contract Claim Before the Court, and Their Inclusion Would Prove Unduly Prejudicial to Defendants.**

Defendants in other motions *in limine* have sought not to exclude specific experts, but to preclude Dr. Brugler from even offering evidence on the following topics in the first place.

- Evidence as to Dr. Brugler's personal belief about Defendants' intentions in handling his claim;

- Evidence about Dr. Brugler's Internet research on Defendants' history of claim handling;

- Evidence that Defendants' request to have Dr. Brugler undergo the Titmus test was unreasonable or outside the standard of care; and

- Evidence that it was unreasonable for Dr. Schaffer, a pediatric ophthalmologist and neuro-ophthalmologist, to conduct the Titmus test on Dr. Brugler.

Defendants argue that these topics should be precluded because they are not relevant to the sole remaining claim before the Court – whether Defendants breached the insurance policy that Dr. Brugler held with them – and because, even

if these topics were to be held to be relevant, they would be unduly prejudicial to Defendants. The Court finds Defendants' arguments well taken.

Dr. Brugler began with five claims: a breach of contract claim; a declaratory judgment claim; a statutory unfair trade practices claim; and statutory and common law bad faith claims.[160] The declaratory judgment claim, unfair trade practices claim, and bad faith claims have all been dismissed, either through stipulation or at summary judgment.[161] The lone remaining claim is breach of contract: whether Defendants breached a duty imposed by their insurance policy with Dr. Brugler, and whether Dr. Brugler suffered resultant damages. *See Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002) (citing *Corestates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). As applied to the terms of the insurance policy, a breach here would entail (1) Dr. Brugler being "totally disabled"—"due to Injuries or Sickness . . . not able to perform the substantial and material duties of [general dentistry]; and (2) Defendants not accordingly paying Dr. Brugler benefits.[162] The fact that Defendants have not paid Dr. Brugler benefits is not in dispute.

Here, Dr. Brugler's personal belief about Defendants' intentions in handling his claim, and Brugler's Internet research on Defendants' history of claim handling, each lack "any tendency" to make it "more probable or less probable" that Dr. Brugler is "totally disabled" under the terms of the policy. Fed. R. Evid.

---

[160] *See* ECF No. 1, ECF No. 43 at 2-3.

[161] *See* ECF No. 43.

[162] *See* ECF No. 85 Ex. 1 at 1-6.

401. Dr. Brugler's personal beliefs about an insurance company's process of handling a claim and its history of claim handling are each divorced from the fact that here undergirds Dr. Brugler's claim: whether he is "totally disabled." As such, these subjects are not relevant to the lone claim pending before the Court and Dr. Brugler is precluded from offering them into evidence.[163]

Even if they were relevant, the Court finds that they are unduly prejudicial, as they present a danger of "unfair prejudice, confusing the issues [and] misleading the jury" in this case. Fed. R. Evid. 403. As Defendants note, this evidence would have the effect of "reinstating (and arguably enhancing) [Dr. Brugler's] bad faith claim."[164] The danger of confusion here is amplified by the fact that Dr. Brugler's historical research appears to be out of date and out of step with Defendants' current practices. Defendants have presented evidence in another litigation that they have "changed [their] internal procedures" in a positive way.[165]

---

[163] *See McGreevy v. Stroup*, No. 1:CV-01-1461, 2003 WL 27374140, at *4 (M.D. Pa. June 17, 2003) (court had already ruled on issue, and therefore plaintiffs' "allegations [were] irrelevant [to lone remaining issue] and would serve no purpose other than to inflame the passions of the jury"); *see also Boyer v. City of Philadelphia*, No. CV 13-6495, 2019 WL 920200, at *10–11 (E.D. Pa. Feb. 25, 2019) (excluding testimony as it was "not relevant to either of plaintiff's remaining claims"); *Ramirez v. United Parcel Serv.*, No. CIV.A.06-1042, 2010 WL 1994800, at *1–2 (D.N.J. May 17, 2010) ("the Court does not see how evidence related to Plaintiff's dismissed claims would be relevant to his remaining claims").

[164] ECF No. 66-1 at 10.; *see McGreevy* at *4.

[165] *Mercado v. First Unum Life Ins. Co.*, No. 11 CIV. 4272 RMB RLE, 2013 WL 633100, at *27 (S.D.N.Y. Feb. 21, 2013); *see also Taylor v. Unum Life Ins. Co. of Am.*, No. 3:11-CV-2602-N, 2013 WL 12250344, at *3 n.2 (N.D. Tex. Feb. 20, 2013) (plaintiff's claims of bias was "simply speculation" as evidence detailing Unum's abusive practices only led up to 2003, seven years before plaintiff filed claim); *Uquillas v. Unum Life Ins. Co. of Am.*, No. CV 07-00542 MMM AJWX, 2010 WL 330255, at *17 (C.D. Cal. Jan. 21, 2010) ("history, without

Likewise, the reasonableness of Defendants' request to have Dr. Brugler undergo the Titmus test and the reasonableness of Dr. Schaffer's performance of the Titmus test also each lack "any tendency" to make it "more probable or less probable" that Dr. Brugler is "totally disabled" under the terms of the policy. Fed. R. Evid. 401. The reasonableness of certain aspects of Defendants' handlings of the claims investigation process is distinct from whether Dr. Brugler is totally disabled. As such, these subjects are not relevant and Dr. Brugler is precluded from offering them into evidence.[166] And, as above, even assuming relevance, any potential probative value to be gleaned from these subjects would be "substantially outweighed" by their tendency to confuse the jury and turn this exercise into an assessment of the claims process as opposed to an assessment of Dr. Brugler's ability to perform his work. Fed. R. Evid. 403. As Defendants note, Dr. Brugler is still free to present evidence that the results of the Titmus test does not establish his ability to practice dentistry.[167]

---

more, does not compel the conclusion that [defendant Unum] reviewed [plaintiff's] claim improperly").

[166] *See* footnote 162 above.

[167] *See* ECF No. 67-1 at 11.

## C. Dr. Schaffer and Friberg's Testimony on the Condition of Dr. Brugler's Eye and Dr. Brugler's Visual Ability Meets the *Daubert* Standard and Will Not Be Excluded.

Unlike Defendants, Dr. Brugler casts a wider net with his motion *in limine* seeking to exclude Defendants' expert testimony. Instead of specifying a particular topic of testimony to be excluded, Dr. Brugler aims to preclude the entire body of testimony of Dr. Schaffer and Dr. Friberg.[168] The Court has sub-divided the testimony at issue into two broad subject matter topics: (1) the condition of Dr. Brugler's eye and on Dr. Brugler's visual ability; and (2) whether Dr. Brugler can practice dentistry. The Court draws different conclusions as to the admissibility of each topic.

Dr. Schaffer and Dr. Friberg are qualified to testify on the subject of the condition of Dr. Brugler's eye and Dr. Brugler's visual ability (including the results of the Titmus test). Each of these witnesses had considerable experience, academic credentials, and training in the visual field.[169] Dr. Schaffer is a neuro-ophthalmologist and pediatric ophthalmologist; such specialists generally conduct Titmus tests.[170] Dr. Friberg was knowledgeable about stereoacuity testing such as Titmus tests and had previously performed Titmus tests on patients, relying on the

---

[168] *See* ECF No. 74 (Dr. Brugler moving the Court "for an Order precluding the Expert Testimony of Dr. Thomas Friberg and Dr. Michael Schaffer").

[169] *See infra* at 16-17, 23.

[170] ECF No. 85 Ex. 7 at 42-43; ECF No. 85 Ex. 23 at 58.

test to measure stereoacuity.[171] Dr. Schaffer and Dr. Friberg's qualifications to opine on the subject of Dr. Brugler's eye and Dr. Brugler's visual ability meet the permissive standard established by the Third Circuit. *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 406-07 (3d Cir. 2003) (witness was qualified via "ample experience," and a particular "academic background and . . . teaching position); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 753 (3d Cir. 1994) (witness was qualified due to "extremely broad" experience, "extensive[]" writing, and consultation in a field); *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 273 (3d Cir. 1991) (witness was qualified via "considerable" experience and training).

With respect to reliability, Dr. Brugler argues that the Titmus test, and stereoacuity testing as a whole, is not reliable or scientifically accepted.[172] The Court disagrees. The Titmus test is the most common way to test a patient's stereoacuity, which ascertains depth perception.[173] The academic journals that Dr. Brugler submitted state that the Titmus test is "commonly used in vision labs and clinics around the world"[174] and "the most commonly available and frequently utilized stereotest worldwide."[175] Dr. Marks admitted that the Titmus test was "an

---

171  ECF No. 85 Ex. 15 at 8, 10-11, 29.

172  ECF No. 74-1 at 14.

173  ECF No. 85 Ex. 23 at 58; see also ECF No. 81-2 Ex. H, ¶ 5; ECF No. 85 Ex. 7 at 177.

174  ECF No. 74-3 Ex. E-1.

175  ECF No. 74-3 Ex. E-2.

independent objective measure" of depth perception.[176] Dr. Vander showed considerable reliance on Titmus test results, both historically and in forming his expert opinion.[177]

The Court acknowledges that the Titmus test is not a perfect instrument, and that false positives appear to be an issue. But any criticisms of the Titmus test's reliability or false-positive rate are best addressed through cross-examination. Given that the Titmus test is commonly accepted throughout the field as an industry standard for the purpose of testing stereoacuity (as Dr. Brugler's own experts acknowledge), the Titmus test meets the *Daubert* threshold for reliability. *See United States v. Williams*, 235 F. App'x 925, 928 (3d Cir. 2007) (technique deemed reliable where government "proffered a detailed explanation" of it, with witness testifying about its methodology and that it was employed by the FBI and other law enforcement agencies).[178]

Finally, Dr. Schaffer and Dr. Friberg's testimony on the condition of Dr. Brugler's eye and Dr. Brugler's visual ability is helpful to the trier of fact, and therefore meets *Daubert*'s "fit" requirement. Courts in the Third Circuit "interpret

---

[176] ECF No. 85 Ex. 7 at 72, 93-96.

[177] ECF No. 85 Ex. 23 at 72-73, 34, 56.

[178] *See also In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2:12-CV-07263, 2016 WL 3997046, at *11 (E.D. Pa. July 26, 2016) (court finding that a methodology was reliable as it was "common," and the opposing party's counsel agreed that it was "acceptable" for the purposes of the motion); *Wicker v. Consol. Rail Corp.*, 371 F. Supp. 2d 702, 717 (W.D. Pa. 2005) (court finding that a model was a reliable methodology as it was "generally accepted" and "common" to a field).

the helpfulness standard broadly." *Am. Tech. Res. v. United States*, 893 F.2d 651, 655 (3d Cir. 1990) (citation omitted). "An expert witness need not testify specifically about a fact in issue so long as his testimony is considered helpful by the trier of fact in determining a fact in issue." *Id.* Here, though this testimony is not specifically on the fact in issue (whether Dr. Brugler is totally disabled), the trier of fact would find testimony on the condition of Dr. Brugler's eye and Dr. Brugler's visual ability helpful in determining whether Dr. Brugler is totally disabled. Accordingly, this testimony "fits" and will not be excluded.

### D. Dr. Friberg's Testimony on Whether Dr. Brugler Can Practice Dentistry Will be Excluded, as Dr. Friberg Was Not Qualified and Did Not Base This Testimony on Reliable Methods or Procedures.

Here, the analysis largely mirrors the discussion above concerning Dr. Marks and Dr. Vander's testimony on this subject. Dr. Friberg was not qualified to testify about whether Dr. Brugler could practice dentistry. And his testimony on this subject was not obtained via reliable methods. Thus, Dr. Friberg's testimony on this subject must be excluded.

### 1. Dr. Friberg Was Not Qualified to Give This Expert Opinion.

As with Dr. Marks and Dr. Vander, Dr. Friberg lacked sufficient knowledge of general dentistry. Dr. Friberg had no training or background in general dentistry,[179] and essentially all he knew about the subject was that generally a

---

[179] ECF No. 81-1 Ex. E.

dentist needs to work in the mouth,[180] some basic duties of general dentistry,[181] and that several times in the papers it was mentioned that precision of a tenth of a millimeter was needed for implant dentistry.[182] This does not meet the Third Circuit's standards for qualification. *See Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055-56 (3d Cir. 1997).[183]

### 2. The Testimony of Dr. Friberg Was Not Based on Reliable Methods or Procedures.

Further—and again, as with Dr. Marks and Dr. Vander—the testimony of Dr. Friberg on this topic was not based on reliable methods or procedures. Dr. Friberg states that it would be "an exaggeration" to conclude that Dr. Marks "would be unable to conduct the fine motor tasks of dentistry," because of Dr. Schaffer's Titmus test results. In making this finding, Dr. Friberg relied on the results of Dr. Brugler's visual acuity tests, the results of Dr. Schaffer's Titmus testing, his "experience after retinal detachment surgery of successful repair," the fact that there was no "scarring underneath the sensory retina," and the fact that, in Dr. Brugler's case, his retina was not "grossly wrinkled"—Dr. Brugler lacked "gross findings that often are apparent when someone has distortion, for instance, such as retinal folds."[184] Notably absent from this list is any data or information

---

[180]  ECF No. 85 Ex. 15 at 51.

[181]  *Id.* at 51.

[182]  *Id.* at 50.

[183]  *See also* footnote 151, above.

[184]  ECF No. 81-2 Ex. H at ¶ 22, ECF No. 85 Ex. 15 at 34, 40, 67.

relating to the duties required of a general dentist. Indeed, Dr. Friberg admitted that he did not study, evaluate, or speak to anyone about what detail was necessary to perform certain dental procedures (the preparation of impressions and the delivery and filling of veneers). And Dr. Friberg also did not do any research on the degree of depth perception needed to perform another dental procedure (an implant).[185] Dr. Friberg's opinion about Dr. Brugler's ability to practice dentistry is based on "assumptions [about the duties of a general dentist] lacking any factual foundation in the record." *See Miller v. United States*, 287 F. App'x 982, 984 (3d Cir. 2008); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

### E.     The Court Requires More Development of the Factual Record with Respect to Dr. Schaffer.

The Court has before it expert reports from Dr. Marks, Dr. Vander, and Dr. Friberg, as well as deposition testimony from Dr. Marks, Dr. Vander, and Dr. Friberg, and affidavits from Dr. Vander and Dr. Friberg.[186] The Court finds that the factual record is sufficiently developed with respect to these experts. *See Feit v. Great W. Life & Annuity Ins. Co.*, 271 F. App'x 246, 253 (3d Cir. 2008) (court did not abuse its discretion in deciding motion *in limine* without a hearing when it could consider briefing and deposition testimony); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (court did not abuse its discretion in deciding motion

---

[185]  ECF No. 85 Ex. 15 at 49-50.

[186]  ECF No. 85 Exs. 6, 7, 12, 14, 15, 19F, 23; ECF No. 74-3; ECF No. 81-2 Ex. H.

*in limine* without a hearing when it could consider an expert's depositions and affidavits).

But Dr. Schaffer does not appear to have been deposed. All the Court has before it with respect to Dr. Schaffer is his expert report and his *curriculum vitae*.[187] The Court finds that this does not suffice to make factual findings about whether Dr. Schaffer was qualified to offer an opinion on expert dentistry or whether he used reliable methods or procedures in offering an opinion on this topic. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (*Daubert* hearing was "a necessary predicate for a proper determination as to the reliability of [expert's] methods"); *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 416–18 (3d Cir. 1999) (*Daubert* hearing was required when court only had expert report that was "insufficiently explained" with "the reasons and foundations for [the expert's opinions] inadequately and perhaps confusingly explicated"). The Court finds that it requires more development of the factual record with respect to Dr. Schaffer before it can fully resolve Plaintiffs' motion to preclude Dr. Schaffer's testimony.

## V.    CONCLUSION

For the reasons discussed above, Defendants' motions *in limine* will be granted, and Dr. Brugler's motion *in limine* will be granted in part and denied in part with respect to Dr. Friberg. The Court requires more development of the

---

[187] ECF No. 85 Ex. 9; ECF No. 81 Ex. A.

factual record with respect to Dr. Brugler's motion *in limine* seeking to preclude Dr. Schaffer's testimony.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge